AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: __2/7/24 JO__

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Premises known as 2332 Southwest 46th Street,<br>Oklahoma City, Oklahoma 73119 | )<br>)<br>)<br>)<br>)<br>) Case No. 24-MJ-138-STE |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

located in the _____Western_____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(2) | Distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct |
| 18 U.S.C. § 2252(a)(4)(B) | Possession of and/or access with intent to view a visual depiction of a minor engaged in sexually explicit conduct |
| 18 U.S.C. § 2252A(a)(2)(A) | Distribution and/or receipt of child pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of and/or access with intent to view child pornography |

The application is based on these facts:

See attached Affidavit of Special Agent Christopher Donovan.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christopher Donovan, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __Feb. 15, 2024__

City and state: ~~Oklahoma City,~~ Lawton, Oklahoma

_____
*Judge's signature*

SHON T. ERWIN, U.S. MAGISTRATE JUDGE
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Christopher Donovan, being first duly sworn, state as follows:

### INTRODUCTION

1.       I am currently employed as a Special Agent (SA) with Homeland Security Investigations (HSI) and have been so since January 2023.  Prior to my federal law enforcement service, I was employed as a police officer with the Houston Police Department for six (6) years, where I conducted complex criminal investigations. I am currently assigned to HSI Office of the Resident Agent in Charge Oklahoma City, Oklahoma. As part of my various duties and responsibilities, I investigate federal criminal cybercrime violations.  As it relates to cybercrime, I have gained experience conducting child exploitation and child pornography investigations.  My working experience has been augmented by training I received at the Federal Law Enforcement Training Center.  Moreover, I have access to the institutional knowledge developed around this type of investigation by working with other experienced child exploitation criminal investigators. I have become aware of numerous examples of child pornography. Additionally, I have had the opportunity to observe and review hundreds of images and videos of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. § 2252 and 2252A, and I am authorized by law to request a search warrant.

### PURPOSE OF AFFIDAVIT

2.       I have probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of violations of 18 U.S.C. § 2252(a)(2) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252(a)(4)(B) (possession of and/or access with intent to view a visual depiction of a minor

1

engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252A(a)(2)(A) (distribution and/or receipt of child pornography (and attempt)); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and/or access with intent to view child pornography (and attempt)) are presently located within 2332 Southwest 46th Street, Oklahoma City, Oklahoma 73119 (the "**SUBJECT PREMISES**"). I submit this Application and Affidavit in support of a search warrant authorizing a search of the **SUBJECT PREMISES**, as further described in Attachments A and B, incorporated herein by reference, which is located in the Western District of Oklahoma. Located within the **SUBJECT PREMISES** to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the entire **SUBJECT PREMISES**, including the residential dwelling and premises structures, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of crime.

3.      The facts set forth in this Affidavit are based upon my personal observations and training, prior investigations and, where noted, information related to me by other law enforcement officers. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## **DEFINITIONS**

4.      The following definitions apply to this Affidavit and Attachment B:

    a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short to enable other participants to respond quickly and in a format that

2

resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

e. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices

3

(including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.   "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.   "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an

4

ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

i. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

j. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

k. "Records," "documents," and "materials," include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

l. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-

genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

m. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON KIK MESSENGER

5.      As explained herein, there is probable cause to believe that the offenses were committed, in part, using "Kik Messenger," which is a free service easily downloaded from the Internet.

6.      Kik Messenger, commonly referred to as "Kik," is a freeware instant messaging mobile application ("app") owned by MediaLab, available free of charge on iOS and Android operating systems. Kik allows its users to chat with other users, as well as browse and share photos and videos and other files with other users via the Kik app. Unlike other messaging apps, Kik does not require users to register or provide their phone number when creating an account. Kik users are only required to provide their name and email address, and are only identifiable by username, which allows Kik users the ability to chat and share content anonymously.

7.      Kik users are able to create chat groups with a limited number of individuals to communicate in a group setting and exchange text messages, images, and videos. These groups are administered by the group creator who has the authority to remove and ban other users from the created group. Once the group is created, Kik users have the option of sharing a link to the

group that includes all of their contacts or any other user. These groups are frequently created with a group name containing a hashtag (#) that is easily identifiable or searchable by keyword.

8.      The Kik mobile application is available for download via the App Store for most iOS devices such as iPhones and iPads. Additionally, the Kik mobile application is available on the Google PlayStore for Android devices. Kik can be used on multiple mobile devices, to include cellular phones and tablets.

9.      In general, providers such as Kik ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, and other identifiers such as an e-mail address. However, this information is not verified by Kik.

10.      Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account. Kik generally maintains at least the last 30 days of all communications for each Kik user.

11.      Kik offers users the ability to create an identity within the mobile application referred to as a "username." This username is unique to the account and cannot be changed. No one else can utilize the same username. A Kik user would have to create a new account in order

7

to obtain a different username. The username for a particular Kik account holder is displayed in their Kik profile.

12.    According to information provided to HSI by a Kik Law Enforcement Response Team Lead, Kik's Terms of Service prohibit Kik users from uploading, posting, sending, commenting on, or storing content that contains child pornography and/or child abuse images. The Terms of Service also provide that Kik may review, screen, and delete user content at any time if Kik believes use of their services are in violation of the law. According to Kik, Kik has a strong business interest in enforcing their Terms of Service and ensuring that their services are free of illegal content, and in particular, child pornography. Accordingly, Kik reports that it independently and voluntarily takes steps to monitor and safeguard their platform and that ridding Kik products and services of child abuse images is critically important to protecting their users, product, brand, and business interests.

## PROBABLE CAUSE

13.    On February 4, 2023, the National Center for Missing and Exploited Children (NCMEC) received a cyber tip from Kik, regarding a Kik user uploading or sharing child pornography images via the messaging app (NCMEC CyberTip 154574335).

14.    Kik reported to NCMEC that between January 8, 2023, and January 9, 2023, Kik user **pasthereyesmilk** uploaded or shared ten (10) photos or videos containing child pornography. The user was reported to Kik on January 22, 2023. Additionally, Kik provided the internet protocol (IP) address from which the child pornography images were being uploaded as IP address 99.100.247.23. This IP address was identified as belonging to AT&T U-Verse, with the subscriber being geo-located to Oklahoma City, OK. On February 22, 2023, Inspectors with the Oklahoma City Police Department (OCPD) Predator Interdiction Unit received this tip to further investigate.

8

15.    On May 16, 2023, OCPD Inspector Stephanie Alfred submitted a court order to AT&T requesting the account subscriber information related to IP address 99.100.247.23 during the dates and times that the child pornography was uploaded to Kik. On May 17, 2023, Inspector Alfred received a response from AT&T, who listed the subscriber as Douglas TACKETT, at 2332 SW 46th Street, Oklahoma City, OK 73119 (**SUBJECT PREMISES**). AT&T also stated in the response that the account has been active at the **SUBJECT PREMISES** since December 21, 2022.

16.    On January 9, 2024, I met with Inspector Alfred at the OCPD investigative office located in Oklahoma City, Oklahoma. Inspector Alfred provided me with all of the information related to this investigation including NCMEC CyberTips[1] and legal process that had previously been served, as well as corresponding responses. I reviewed all of the information that was received and reviewed the information contained within the CyberTips, to include photos and videos that were uploaded to Kik. During this review, I confirmed that file name "427c70a8-653c-46bd-bd12-51afae8b54cf" is a photo of a nude prepubescent female showing her buttocks and vagina. Additionally, I confirmed that file name "2567e31b-d96c-4ca5-8cef-26720e7bbbfc" is a video of a prepubescent female engaging in sexual intercourse with a male.

17.    On January 23, 2024, I issued a Customs Summons to AT&T requesting the account subscriber information related to IP address 99.100.247.23. On January 23, 2024, I received a response from AT&T, who listed the subscriber as Douglas TACKETT, at 2332 SW 46th Street, Oklahoma City, OK 73119 (the **SUBJECT PREMISES**). AT&T also stated in the response that the account has been active at the **SUBJECT PREMISES** since December 21, 2022.

---

[1] There are six additional NCMEC CyberTips pertaining to IP address 99.100.247.23 in addition to the CyberTip described above, with the most recent tip involving conduct occurring in September 2023.

AT&T's response also reflected that the subscriber account was still ongoing and current as of January 23, 2024.

18.     On January 12, 2024, I issued a Customs Summons to Oklahoma Gas and Electric Company (OG&E) requesting account holder information at the **SUBJECT PREMISES**. On January 25, 2023, I received a response from OG&E, who listed the account holder as Donna Gail TACKETT.

19.     As previously stated, Kik users are only required to provide a name and email address at the time that a Kik account is created. The email account associated with Kik user **pasthereyesmilk** was identified by Kik as cubicle_unbaked.0n@icloud.com. iCloud, a cloud service owned and operated by Apple Inc., is a cloud-based online storage service that enables Apple customers and users the ability to store and backup devices running on Apple operating systems (iPhone, iPad, etc.).

20.     On April 16, 2023, Inspector Alfred submitted a search warrant to Apple Inc. for customer information and content associated with the iCloud account cubicle_unbaked.0n@icloud.com. In May 2023, Inspector Alfred received a response from Apple Inc., to include the content of said account. I reviewed the content and information received from Apple Inc. and found evidence that the iCloud account is owned or used by **Billy PAYAHSAPE** ("the **SUBJECT**").[2] While conducting records checks utilizing law enforcement databases, I found that the **SUBJECT**'s current listed address is that of the **SUBJECT PREMISES**. Further, the **SUBJECT** lists the **SUBJECT PREMISES** as his address on his driver's license.

---

[2] One of the additional NCMEC CyberTips mentioned in footnote 1 of this Affidavit involves a username containing the name "billy."

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

21.    I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

a.  Computers and digital technology play a large role in the way individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, storage, communication, and distribution.

b.  Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer with a cable or via wireless connections, such as "Wi-Fi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.  A device known as a modem allows any computer to connect to another computer using a telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage

media (commonly referred to as the hard drive) can store thousands of images at very high resolutions. Hard drives, either standalone or internal, are able to hold one terabyte of information are not uncommon. In addition, there are numerous options available for the storage of digital files. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. CDs and DVDs are not as instantaneous though. They require software to save or "burn" files onto them. Some media storage devices, like smartphones and/or mobile phones, can easily, and are often perpetually concealed and/or carried on an individual's person.

e.  The Internet affords individuals several venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. For example, distributors of child pornography can use membership-based/subscription-based websites to conduct business, allowing them to remain relatively anonymous. Additionally, distributors can use file sharing software or Peer-to-Peer software (P2P). This P2P software allows users to share files with other users running compatible software on this P2P file-sharing network.

f.  Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes

12

referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or internet service provider (ISP) client software, among others). In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data. Accordingly, a computer forensic examiner can often find evidence of deleted files on a user's computer. Thus, if a user has downloaded image files, viewed them, then deleted them, a computer forensic examiner can often find evidence of such actions and maybe even the deleted images themselves. Even in cases where online storage is used, evidence of child pornography can still be found on the user's computer or external media in most cases.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO TRANSPORT, DISTRIBUTE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

22.    Based on my previous investigative experience related to child exploitation

investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce, advertise, transport, distribute, receive, possess, and/or access with intent to view child pornography:

    a.  Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

    b.  Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts to their selected partners.

    c.  Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain their pictures, films, video tapes, photographs, magazines, negatives, correspondence, mailing lists, books, tape recordings and child erotica for many years.

    d.  Likewise, such individuals often maintain their child pornography images in a

digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. A child pornography collector is most likely to keep the collection at home (as opposed to place of employment, a storage unit, etc.), where access to it can be carefully controlled. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[3]

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their

---

[3] *See United States v. Wagner,* 951 F.3d 1232, 1246 (10th Cir. 2020) ("Courts are less receptive to staleness challenges when the warrant concerns child pornography because 'persons interested in those materials [are likely to hoard them] in the privacy of their homes . . . for significant periods of time.'" (quoting *United States v. Perrine,* 518 F.3d 1196, 1206 (10th Cir. 2008)). *See also United States v. Carroll,* 750 F.3d 700, 706 (7th Cir. 2014) (concluding that five-year delay was not too long because "a staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *United States v. Seiver,* 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, *e.g., United States v. Allen,* 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson,* 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis,* 605 F.3d 395, 402 (6th Cir. 2010)).

sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g.  Such individuals prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if an individual uses a portable device (such as a mobile phone) to access the internet and child pornography, it is more likely than not that evidence of this access will be found in their home, here, the **SUBJECT PREMISES**, as set forth in Attachment A.

h.  In my experience and that of other agents with experience investigating child exploitation crimes, individuals who trade and share child pornography via the Internet retrieve and store the child pornography (whether they produced it or obtained it from other sources) on an electronic storage device as previously stated. As also previously stated, individuals who trade and share child pornography tend to retain their collection of child pornography on digital media (such as hard drives, computers and/or cell phones), which can be stored for a very long amount of time, and tend to keep their collection nearby and secured, usually within their residence or on their person. It is well-known that when individuals relocate from one residence to another, they take their valued possessions (such as vehicles, furniture, clothes, important documents, computers, electronic devices, etc.) with them and store them in their new residence.  In my experience and that of other agents, individuals that produce, share and/or trade child pornography view the child pornography as valued

16

possessions and take the electronic devices storing the child pornography with them to their new residence.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

23.    As described above and in Attachment B, this Application seeks permission to search for records that might be found on the **SUBJECT PREMISES** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

24.    I submit that if a computer or storage medium is found on the **SUBJECT PREMISES** and is reasonably believed to be used by or associated with the **SUBJECT**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In

17

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

25.    As further described in Attachment B, this Application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium that is reasonably believed to be used by or associated with the **SUBJECT** because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs,

and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and

19

durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

    c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how

20

computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, pieces, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti- virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal

21

conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

26.     Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for several reasons, including the following:

   a.   Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

   b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly

22

vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Computer users can attempt to conceal data within computer equipment and storage devices through several methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

27.    Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a computer system's input

23

and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

      a. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

      b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

28.     Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless

24

routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

29.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am seeking would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICES

30.    The warrant I am applying for would permit law enforcement to obtain from the **SUBJECT** the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

25

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition

26

features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

    d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

    e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

    f.  As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the electronic devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the electronic device(s), making the use of biometric

features necessary to the execution of the search authorized by this warrant.

g.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for eight hours and the passcode or password has not been entered in the last six days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device

28

is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require the **SUBJECT**, if found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

i.   Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant would permit law enforcement personnel to obtain from the **SUBJECT** the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the **SUBJECT** to the fingerprint scanner of the device(s) found at the **SUBJECT PREMISES**; (2) hold the device(s) found at the **SUBJECT PREMISES** in front of the face of the **SUBJECT** to activate the facial recognition feature; and/or (3) hold the device(s) found at the **SUBJECT PREMISES** in front of the face of the **SUBJECT** to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

j.   The proposed warrant does not request authority for nor authorize law enforcement to compel any person to state or otherwise provide the password for, or to identify which specific biometric characteristics (including the unique finger(s) or other physical features) may be used to unlock or access any device(s). However, during the execution of the requested warrant, law enforcement agents may seek to obtain such information voluntarily from persons present at the **SUBJECT**

PREMISES.

## CONCLUSION

31.    Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

32.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Christopher Donovan
Special Agent
Homeland Security Investigations

Sworn and subscribed before me this 15th day of February, 2024.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE

30

**ATTACHMENT A**

**DESCRIPTION OF LOCATIONS TO BE SEARCHED**

The entire property located at 2332 Southwest 46th Street, Oklahoma City, Oklahoma 73119 (the **SUBJECT PREMISES**), including a single-story residence, any outbuildings, vehicles, and any appurtenances thereto. The **SUBJECT PREMISES** is a single-family home with a dark-colored roof, light blue siding, and black shutters. The front portion of the **SUBJECT PREMISES** has a concrete porch, and the numbers "2332" in dark lettering affixed to the right side of the front door. The **SUBJECT PREMISES** is shown below:



The search of the **SUBJECT PREMISES** also includes the search of any persons found or arriving on the **SUBJECT PREMISES** during the course of the search to search for the items described in Attachment B. These persons include, but are not limited to, **Billy PAYAHSAPE** (the **SUBJECT**), whose date of birth is 8/XX/1968, and whose photo is depicted on the following page:

31



**ATTACHMENT B**

**PROPERTY TO BE SEIZED**

The following materials reasonably believed to be used by, made by, possessed by, or associated with **Billy PAYAHSAPE** (the **SUBJECT)**, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2252(a)(2) (distribution and/or receipt of a visual depiction of a minor engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252(a)(4)(B) (possession of and/or access with intent to view a visual depiction of a minor engaged in sexually explicit conduct (and attempt)); 18 U.S.C. § 2252A(a)(2)(A) (distribution and/or receipt of child pornography (and attempt)); and 18 U.S.C. § 2252A(a)(5)(B) (possession of and/or access with intent to view child pornography (and attempt)):

1.      Computer(s), as broadly defined in 18 U.S.C. § 1030(e), other digital file storage devices, computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography;

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs;

3.      Any and all notes, documents, records, or correspondence, in any format and

33

medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, distribution or accessing with the intent to view (or the attempt to do so) child pornography as defined in 18 U.S.C. § 2256(8), or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.    In any format and medium, all originals, computer files, copies, and negatives of child pornography, as defined in 18 U.S.C. § 2256(8), and visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

5.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

6.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography, as defined in 18 U.S.C. § 2256(8), or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

7.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater

to those with an interest in child pornography;

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make child pornography accessible to members;

9.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage;

10.     Any and all cameras, film, videotapes or other photographic equipment;

11.     Any and all visual depictions of minors engaging in sexually explicit conduct;

12.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography, as defined in 18 U.S.C. § 2256(8), or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

13.     Any and all documents, records, or correspondence, in any format or medium

35

(including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence;

14.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2); and

15.    All fruits, instrumentalities, and evidence, in any format or medium, of violations of 18 U.S.C. § 2252A's enumerated offenses.

During the execution of the search of the **Subject Premises** described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of **Billy PAYAHSAPE** (the **SUBJECT**) to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face that same individual and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.